**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| CHERYL UPSHAW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CAUSE NO.: 2:05-CV-287-PRC |
| | ) | |
| ISPAT INLAND, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment [DE 57], filed by the Defendant, Ispat Inland, Inc., on September 21, 2006. For the following reasons, the Defendant's Motion for Summary Judgment is granted.

**PROCEDURAL BACKGROUND**

On October 1, 2004, the Plaintiff, Cheryl Upshaw, filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that the Defendant discriminated against her on the basis of race. On May 4, 2005, the EEOC issued its Notice of Right to Sue to the Plaintiff.

On August 1, 2005, the Plaintiff filed her Complaint in this Court alleging discrimination under Title VII, 42 U.S.C. §§ 2000e, *et seq*. Specifically, the Plaintiff alleges in her Complaint that she is entitled to relief in this action because "adverse employment actions resulted in disp[a]rate treatment causing a disp[a]rate impact on Plaintiff's quality of life." (Compl. § III). Plaintiff also alleges the following facts in her Complaint to support her claim of discrimination under Title VII: "(1) Defendant hired 18 employees with less education and/or work experience[;] (2) Defendant

allowed employees who were openly racist [to] influence management's opinions about plaintiff and promotion decisions[, and] (3) [Defendant's] management and employees created [a] hostile work environment. (Comp. § IV).  On September 20, 2005, the Defendant filed its Answer.  On October 12, 2005, and again on November 14, 2005, the Plaintiff filed a motion for the appointment of counsel.  The Court denied both motions.

On September 21, 2006, the Defendant filed its motion for summary judgment and supporting materials.  On September 21, 2006, the Defendant served on the Plaintiff and filed with the Court a Notice to *Pro Se* Litigant which sets forth the summary judgment standard as well as the obligations of the Plaintiff in responding to the summary judgment motion.  On October 20, 2006, the Plaintiff filed a Memorandum Objecting to Defendant's Motion for Summary Judgment with the Court asking the Court not to grant summary judgment for the Defendant.  Although the Plaintiff's brief contains ten pages of issues and facts, it does not set forth the genuine issues she believes remain for trial or designate any of the material facts in the Defendant's Statement of Material Facts as in dispute, *see* Local Rule 56.1.

The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case.  Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## FACTS

The following are the facts viewed in the light most favorable to the nonmoving party.[1]

Plaintiff is an African-American woman.  Defendant is a Corporation engaged in the manufacture and distribution of steel.  Plaintiff began her employment with Defendant in April of 1999 as a Laborer and was paid at the rate of approximately $13.00 per hour.  Plaintiff worked as a Laborer for Defendant for approximately three months until she applied for the position of Wrapper. Plaintiff worked as a Wrapper for approximately a year and earned approximately $15.00 per hour. Plaintiff then applied for her current position, Inspector.  Plaintiff is paid $19 per hour as an Inspector on Defendant's "29 Temper Mill" and can earn up to a $400.00 in incentives per pay period as an Inspector.  Her responsibilities as an Inspector include inspecting steel that is rolled, finished and coiled by the other members of her production line.

### A.  Plaintiff's Efforts In Seeking Promotion

Defendant regularly posts its open positions, including supervisory and management positions on its intranet website and on various internet websites.  Defendant also posts its open

---

[1] Local Rule 56.1(a) requires that a party opposing a motion for summary judgment submit a response that includes a "Statement of Genuine Issues" setting forth all material facts as to which a genuine issue exists and which may be litigated.  Local Rule 56.1(a) further provides that the "Statement of Genuine Issues" and the facts stated therein shall set forth all material facts, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence.  In the "Statement of Genuine Issues," the nonmoving party's response is not required "to respond to each and every fact, point by point, [but] it does require that the nonmoving party submit potentially determinative facts and identify factual disputes" that may preclude summary judgment.  *See Fox v. Lear Corp.*, 327 F. Supp. 2d 946, 948 (S.D. Ind. 2004).  Failure to include such crucial facts may be detrimental to the non-movant's case because the Court assumes the facts as claimed and supported by admissible evidence submitted by the moving party, unless they are controverted with supporting evidence by the nonmoving party.  *See* L.R. 56.1(b).  Plaintiff has not provided a Statement of Genuine Issues.  The only evidence submitted by the Plaintiff is a portion of her deposition testimony. Accordingly, the Court relies on the admissible material facts in the Defendant's Statement of Material Facts that are not contested by Plaintiff's citations to her deposition testimony as well as any supported material facts set forth in the Plaintiff's brief.

nonsupervisory positions on notices throughout its East Chicago, Indiana location and on its intranet website. Although Plaintiff accessed the Defendant's website to search for career opportunities approximately four times a year since she began her employment with Defendant, Plaintiff did not apply for any supervisory or management positions with Defendant.

In 1999, Plaintiff spoke with Bill Sammon, the head of her department, and asked him what he was looking for in a supervisor. Plaintiff had heard talk around the department about the possible promotion of Hugo Garcia, an hourly supervisor, to a salaried supervisor. Plaintiff discussed her background, both work and educational, with Mr. Sammon and he told Plaintiff he would keep her in mind.

Plaintiff also had a conversation with Kim Galvan, a manager, wherein Plaintiff stated she was "kind of interested" in a salaried supervisor position, but Plaintiff could not remember when that conversation occurred. On September 4, 2004, Plaintiff had a conversation with Mike Cummings, a manager, regarding promotion to a supervisory or management position. In that conversation, Plaintiff asked Mr. Cummings "what is going on" with respect to promotions and he told her that she was not being promoted because she didn't get along with her peers. Plaintiff could recall no other conversations during her employment with any other managers about promotion to an hourly or exempt supervisory position.

Between 1999 and October 1, 2004, the date Plaintiff filed a charge of discrimination with the EEOC, Defendant promoted seven African-Americans as hourly supervisors. Between 1999 and October 1, 2004, Defendant hired 18 exempt supervisors or managers, of which twelve were Caucasian, three were Hispanic, one was American-Indian and two were African-American. Plaintiff is aware that Vanessa Cohen, an African-American female, was promoted to a supervisory

position by Defendant during Plaintiff's employment with Defendant.  Plaintiff is unaware of any of the specific qualifications or experience of those promoted to supervisory or management positions during her employment with Defendant.

### B.  Defendant's Anti-Harassment Policies

Defendant has in place a Harassment Complaint Procedure and a Freedom From Harassment Policy which define harassment as any behavior based upon race, color, religious belief, citizenship, national origin, ethnicity, age, disability, veteran status, or sex, that creates, or is reasonably perceived by an individual to create, a hostile, offensive or intimidating work environment. Defendant's Harassment Complaint Procedure provides that any employee who believes he or she is being harassed by another employee may report that harassment to his or her immediate supervisor, department manager, human resources area manager, the Manager of Personnel Services or the Director of Human Resources.  Defendant's Harassment Complaint Procedure provides that, once an employee's complaint of harassment is reported, Defendant's Human Resources department will conduct a confidential and timely investigation of the complaint and recommend appropriate disciplinary action if warranted.  The Defendant provides a Harassment Summary Pamphlet to all of its employees that provides instructions and guidance to employees who feel that they have been the victim of racial or sexual harassment.   Defendant's agreement with the bargaining unit employees, including Plaintiff, which is entitled "Agreement Between Ispat Inland Inc. and United Steelworkers of America Local 1010 ("the Agreement") dated August 1, 1999, establishes a Joint Civil Rights Committee whose responsibility is to review and investigate complaints filed with it by employees or their union representatives.

Upon commencement of employment or at some time thereafter, all of Defendant's employees received a copy of the Harassment Complaint Procedure, Freedom From Harassment Policy, the Harassment Summary Pamphlet, and the Agreement.  Plaintiff attended Defendant's orientation sessions in May of 1999 and also attended a subsequent orientation session in May of 2005.

### C.  Plaintiff's Relationship With Catherine Rodriguez

Plaintiff alleged that a Hispanic female, fellow bargaining unit employee, Catherine Rodriguez, who worked as a Coiler on Plaintiff's production line, verbally and physically abused her continually beginning in December 2001.  Examples of the alleged abuse testified to by Plaintiff include Ms. Rodriguez elbowing and bumping into Plaintiff when passing by Plaintiff in their work area, yelling at Plaintiff, acting belligerent to Plaintiff, giving Plaintiff the finger, and yelling to co-workers not to help Plaintiff.  Plaintiff did not report to Defendant's managers any specific dates or instances where Ms. Rodriguez made racially abusive remarks in reference to Plaintiff.

In May of 2002, Plaintiff and Ms. Rodriguez had a disagreement as to whether Plaintiff, an Inspector, or Ms. Rodriguez, a Coiler, was responsible for carrying out a quality control task on the production line.  On or about May 30, 2003, Plaintiff requested a meeting with managers, Ms. Galvan, Jimmy Wachadlo, David Jillson and fellow bargaining unit employees Ms. Rodriguez and Sal DelToro to discuss whose responsibility it was to carry out the quality control task.  During this May 30, 2003 meeting, Plaintiff told Defendant's managers that the only reason Ms. Rodriguez would not take responsibility for the quality control task was because of Plaintiff's race.  During the May 30, 2003 meeting, Plaintiff did not report to Defendant's management any other conduct of Ms.

6

Rodriguez that Plaintiff considered to be racial harassment.  Between May 30, 2003 and May 30, 2004, Plaintiff did not report any instances of racial harassment to her direct supervisor, Catherine Drye.

On or about March 25, 2004, another meeting was held to address the work responsibilities of Plaintiff and Ms. Rodriguez.  Present at this meeting were Plaintiff, Ms. Rodriguez, Ms. Galvan, Mr. Jillson and Floyd Kinzie, Plaintiff's union representative.  At the March 25, 2004 meeting, Plaintiff did not report any instances of racial harassment to Defendant's managers.  Plaintiff did not report any instances of racial harassment by Ms. Rodriguez to Defendant's Human Resources Department during her employment with Defendant.  Plaintiff testified that both she and Ms. Rodriguez were sent home as punishment for the incidents discussed in the meetings.

### D.  Plaintiff's Claims of Discrimination In The Terms and Conditions Of Employment

On June 18, 2004, Plaintiff was asked to work overtime by Ms. Drye.  Plaintiff refused Ms. Drye's request stating that she had to go home to take her blood pressure medication.  As a result, Plaintiff was required to go to the company clinic, was subsequently sent home, and then missed three days of work due to her elevated blood pressure.  Plaintiff testified that she does not believe that Ms. Drye's actions on June 18, 2004 were racially motivated.

On July 29, 2004, Plaintiff was given a written reprimand by Ms. Drye for failure to have a mandatory face-to-face conversation with the inspector relieving her shift.  Plaintiff believes that Ms. Drye's decision to issue the July 29, 2004 reprimand was racially motivated because of Plaintiff's belief that other employees influenced Ms. Drye to issue the reprimand.  Plaintiff also claims that she was treated differently in this situation than a Caucasian employee was treated in a

similar situation.  Plaintiff testified that on August 24, 2004, she came in to work at 6:58 and there was no person for her to relieve.  She contacted Ms. Drye and asked where the person was that she was suppose to be relieving and Ms. Drye told Plaintiff that the employee had special permission to leave early.  Plaintiff has admitted that she did not know all the facts or why management told the Caucasian employee that he could leave early, but claimed she was subjected to disparate treatment solely because the other employee was white and she was black.

Plaintiff alleged that she has been discriminated against based on her race with respect to the assignment of overtime.  Plaintiff admitted that she has turned down overtime numerous times when it has been offered to her.  Plaintiff further admitted that she had no facts that establish that she was discriminated against based on her race with respect to the assignment of overtime.  Although Plaintiff has alleged that she was discriminated against based on her race with respect to her requests for days off being granted, she could not identify a specific date when this discrimination occurred.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed.

9

R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

## DISCUSSION

Plaintiff alleges that the Defendant discriminated against her on the basis of race in violation of Title VII , 42 U.S.C. §§ 2000e, *et seq*. Plaintiff claims that the Defendant failed to promote her to a supervisory or management position and that she was subjected to disparate treatment in the terms and conditions of her employment. Plaintiff also contends that she was subjected to a hostile work environment. The Court will discuss each of the Plaintiff's claims in turn.

### A.  Failure to Promote

Plaintiff alleges that the only reason that she was not promoted to a supervisory or management position was because she is African-American and all others promoted or hired are Caucasian.

Title VII prohibits discrimination with respect to terms, conditions, or privileges of employment on the basis of race, color, religion, sex or national origin.  42 U.S.C. § 2000e-2(a)(1). A plaintiff can support her Title VII claim for failure to promote in one of two ways: "she may directly show that racial discrimination motivated the employment decision, or, as is more common, she may rely on the indirect, burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.E.2d 668 (1973)."  *See Perdomo v. Browner*, 67 F.3d 140, 144 (7th Cir.1995) (citations omitted).   In this case, the Plaintiff has not presented any direct evidence of discrimination.  Therefore, the Court will analyze her failure to promote claim under the indirect method of proving discrimination articulated in *McDonnell Douglas Corp.*  To establish a *prima facie* case under the indirect method in the context of failure to promote, a plaintiff must show that: "1) [s]he belongs to a protected class, 2)[s]he applied for and was qualified for the position sought, 3)[s]he was rejected for that position [,] and 4) the employer granted the promotion to someone outside the protected group who was not better qualified than the plaintiff."  *Grayson v. City of Chicago,* 317 F.3d 745, 748 (7th Cir.2003).  If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for deciding not to promote the plaintiff.  *See Johnson v. Nordstrom*, 260 F.3d 727, 731-32 (7th Cir.2001).

Plaintiff satisfies the first prong of the *prima facie* case for race discrimination.  She is an African American and is, therefore, a member of a protected class.  However, it appears that Plaintiff

cannot satisfy the second prong since she has failed to establish that she applied for any supervisory or management positions.  Yet, the essence of Plaintiff's failure to promote claim is that she was denied the opportunity to apply for a supervisory or management position, and so the Court will further address this element.

Although not addressed by the Seventh Circuit, courts have recognized that a "failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a *prima facie* claim, ··· as long as the plaintiff made every reasonable attempt to convey h[er] interest in the job to the employer." *Chambers v. Wynne School District*, 909 F.2d 1214, 1217 (8th Cir.1990) (quoting *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir.1990)).  Since Chambers, the Eighth Circuit generally does not require a formal application to establish a *prima facie* case for failure to promote, provided that "the job opening was not officially posted or advertised and either (1) the plaintiff had no knowledge of the job from other sources until it was filled, or (2) the employer was aware of the plaintiff's interest in the job notwithstanding the plaintiff's failure to make a formal application." *Gentry v. Georgia-Pacific Corp.*, 250 F.3d 646, 652 (8th Cir.2001). Other courts have also declined to require a formal application where the plaintiff's failure to apply is justified by the circumstances. *See, e.g., EEOC v. Metal Serv. Co.,* 892 F.2d at 349 (stating that plaintiffs "followed precisely the procedure established by [defendant] for how a person applies for a job at the company"); *Holsey v. Armour & Co.*, 743 F.2d 199, 208-09 (4th Cir.1984) (noting that sales jobs were not posted and that defendant's representatives testified that one way to move into the position was to talk with a supervisor as the plaintiff had done); *Lederer v. Argonaut Ins. Co.*, No. 98 C 3251, 2000 WL 126933, \*5 (N.D. Ill. Jan. 28, 2000) (finding that a jury could reasonably conclude that the plaintiff

"made every reasonable effort to convey an interest in the claims analyst position, thus excusing a duty to formally apply.").

Defendant has presented undisputed evidence that it regularly posts its open positions, including supervisory and management positions on its intranet website and on various internet websites. Plaintiff testified that she accessed the Defendant's website to search for career opportunities approximately four times a year since she began her employment with Defendant, but that she did not apply for any supervisory or management positions with Defendant.

Plaintiff's only attempts to obtain a supervisory or management position include a conversation in 1999 with Bill Sammon, the head of her department, in which Plaintiff inquired as to what Mr. Sammon was looking for in a supervisor and discussed her background with him; a conversation with Kim Galvan, a manager, wherein Plaintiff stated that she was "kind of interested" in a salaried supervisor position; and a conversation in September 2004 with Mike Cummings, a manager, regarding promotion to a supervisory or management position, during which Plaintiff asked "what is going on" with respect to promotions and was told that she was not being promoted because she didn't get along with her peers. Plaintiff admitted that she could recall no other conversations during her employment with any other managers about promotion to an hourly or exempt supervisory position.[2]

---

[2] Plaintiff testified that she contacted the Defendant's employment office in March 2006, and spoke with Betty M. about supervisors being hired but was told that there were no supervisors being hired with work experience and that the company was "only going to hire grads at this particular time." Upshaw Dep. 201:5-12, June 29, 2006. The Court will not consider this statement in its analysis since the Plaintiff's conversation with Betty M. took place after Plaintiff properly filed her EEO charge. *See National R.R. Passenger Corp. v. Morgan* 536 U.S. 101, 110-112, (U.S. 2002). Plaintiff also states in her response brief that she intends to testify that Wendy Boos, Personnel Services Representative for the Defendant, told Plaintiff to seek employment opportunities elsewhere and that there was no one in the company who could be a mentor to Plaintiff in Plaintiff's quest for a management position. However, because Plaintiff has provided no supporting evidence such as an Affidavit or appropriate citation to deposition testimony, the Court will not consider these statements in its analysis.

Plaintiff has provided no evidence that the supervisory or management positions for which she was interested were not officially posted or advertised.  Further, based on the evidence before the Court, the Court finds that the Plaintiff did not make every reasonable attempt to convey her interest in supervisory or management positions to the Defendant.  Plaintiff expressed only a general interest in supervisory and management positions, and failed to actually apply for any such positions even though she was aware of how to search and apply for career opportunities with the Defendant.

Regarding the fourth prong, Plaintiff has presented no evidence as to the qualifications and race of those persons hired or promoted to supervisory or management positions and thus has not satisfied her burden to show that the Defendant granted a promotion to someone outside the protected group who was not better qualified than the Plaintiff.  Because the Plaintiff has failed to satisfy the second and fourth prongs of a *prima facie* case under the indirect method, the Court finds that the Plaintiff has failed to establish a *prima facie* case of racial discrimination based on failure to promote.[3]

### B.  Disparate Treatment in the Terms and Conditions of Plaintiff's Employment

In her Complaint, Plaintiff alleges that she is entitled to relief in this action because "adverse employment actions resulted in disp[a]rate treatment causing a disp[a]rate impact on Plaintiff's quality of life."  (Compl. § III).

---

[3] Even if this Court were to find that the Plaintiff had established a *prima facie* case of discrimination based on failure to promote, which it does not, it appears that the Plaintiff would not be able to establish by a preponderance of the evidence that the Defendant's proffered reason for not promoting her, the Plaintiff's inability to get along with her peers, is pretextual.  *See Perdomo v. Browner*, 67 F.3d 140, 144 (7th Cir. 1995).

To prevail on her claim of race discrimination in the terms and conditions of her employment, Plaintiff must present evidence that, if believed by the trier of fact, would show: (1) she was a member of a protected class; (2) her performance met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who are in a different class.  *See Bio v. Federal Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005).  If the Plaintiff meets this burden, the Defendant has the opportunity to articulate a legitimate nondiscriminatory reason for its action; if it does so, the burden shifts back to the Plaintiff to show that this reason is pretextual.  *Id.*  The failure to establish any one of the initial four elements defeats a discrimination claim.  *Id.*

Again, it is undisputed that the Plaintiff meets the first prong of the *prima facie* case: the Plaintiff, as an African-American, is a member of a protected class.

However, under the third  prong, a Title VII plaintiff must demonstrate that she suffered a materially adverse employment action.  *See Oest v. Illinois Dep't. of Corrections*, 240 F.3d 605, 612-613 (7th Cir. 2001); *Sweeney v. West*, 149 F.3d 550, 556-557 (7th Cir. 1998).  An adverse employment action involves a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  *See Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).  An adverse employment action is one that significantly alters the terms and conditions of the employee's job.  *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004).  "[N]ot everything that makes an employee unhappy is an adverse action."  *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). A materially adverse employment action must be:

> . . . more disruptive than a mere inconvenience or an alteration of job responsibilities.
> A materially adverse change might be indicated by a termination of employment, a

> demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996). Allegations of generalized racial discrimination against others do not satisfy this requirement; a plaintiff must demonstrate that he or she has suffered a specific materially adverse employment action. *See, e.g., Grayson v. O'Neill*, 308 F.3d 808, 816-817 (7th Cir. 2002).

Oral and written reprimands were specifically rejected as a basis for finding an adverse employment action in *Oest v. Illinois Department of Corrections*, 240 F.3d 605 (7th Cir. 2001). In *Oest*, a corrections officer contended that several oral and written reprimands which she had received were each actionable under Title VII. The Seventh Circuit affirmed the trial court's entry of summary judgment in favor of the employer, specifically rejecting the plaintiff's contention that the oral or written reprimands which the plaintiff had received could be considered as adverse employment actions. *Id.* at 613; *accord Sweeney*, 149 F.3d at 556 (7th Cir. 1998).[4] The Court in *Oest* explained that "job-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship" and that the plaintiff had "not pointed to any immediate consequence of the reprimands, such as ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities." *Oest*, 240 F.3d at 613.

---

[4] "Absent some tangible job consequence accompanying [the] reprimands, we decline to broaden the definition of adverse employment action to include them." *Sweeney*, 149 F.3d at 556. Even a reassignment or transfer from one position to another, without some significant change in salary or benefits, has been rejected as a basis for finding an adverse job action. *See Crady v. Liberty National Bank and Trust Company of Ind.*, 993 F.2d 132, 134-36 (7th Cir. 1993); *Spring v. Sheboygan Area School District*, 865 F.2d 883, 885-86 (7th Cir. 1989).

The Plaintiff claims that Defendant violated Title VII when it subjected her to disparate treatment on June 18, 2004.  On that date, Plaintiff was asked to work overtime by her supervisor, Ms. Drye.  Plaintiff refused Ms. Drye's request and stated that she had to go home to take her blood pressure medication.  As a result, Plaintiff was required to go to the clinic, was subsequently sent home, and then missed three days of work due to her elevated blood pressure.  Requiring Plaintiff to go to the clinic due to concerns about her blood pressure does not rise to the level of an adverse employment action under Seventh Circuit caselaw.  In addition, Plaintiff has testified that she does not believe that Ms. Drye's actions on June 18, 2004 were racially motivated.

Plaintiff further alleges that Defendant violated Title VII on July 29, 2004, when Plaintiff was given a written reprimand by Ms. Drye for failure to have a mandatory face-to-face conversation with the inspector relieving Plaintiff's shift.  Plaintiff believes that Ms. Drye's decision to issue the reprimand was racially motivated because of Plaintiff's belief that other employees influenced Ms. Drye to issue the reprimand.  As set forth by the Court, oral or written reprimands of this kind do not qualify as a materially adverse employment action.  *See Oest*, at 613; *Sweeney*, 149 F.3d at 556.

Plaintiff also claims that she was discriminated against based on her race with respect to the assignment of overtime.  However, Plaintiff admitted that she turned down overtime numerous times when it was offered to her.  Plaintiff has presented no evidence to establish that she was discriminated against based on her race with respect to the assignment of overtime.  In addition, Plaintiff alleged that she was discriminated against based on her race with respect to earning incentive pay but has offered no evidence to support this allegation.  Lastly, Plaintiff alleged that she was discriminated against based on her race with respect to her requests for days off being

granted, but could not identify a specific date when this discrimination occurred.  Plaintiff has presented no evidence to support such a claim.

Because the Plaintiff has not demonstrated that she suffered a materially adverse employment action necessary to satisfy the third prong of a *prima facie* case of employment discrimination, Defendant is entitled to summary judgment on Plaintiff's claim of racial discrimination in the terms and conditions of her employment.[5]

### C.  Hostile Work Environment

Title VII also prohibits employers from maintaining a hostile work environment. *See Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004).  "A hostile environment is one that is 'permeated with discriminatory intimidation, ridicule and insult.'"  *Id.* (quoting *Shanoff v. Ill. Dep't. of Human Servs.*, 258 F.3d 696, 704 (7th Cir.2001)). In order for Plaintiff to state a hostile work environment claim under Title VII, she must demonstrate: "1) [s]he was subject to unwelcome harassment; 2) the harassment was based on h[er] race . . . ; 3) the harassment was severe [or] pervasive so as to alter the conditions of the employee's environment and create a hostile or abusive working environment; and 4) there is a basis for employer liability."  *Cooper-Schut*, 361 F.3d at 426 (internal quotations omitted).

In determining whether harassment in the workplace is severe or pervasive, courts look to the surrounding circumstances which "may include the frequency of the discriminatory conduct; its

---

[5] Although not necessary to its analysis, the Court notes that Plaintiff also fails to satisfy the second and fourth prongs of a *prima facie* case of employment discrimination because she presented no evidence that she was meeting her employer's legitimate work expectations and presented no evidence that Defendant treated non-African Americans who were similarly situated to Plaintiff more favorably with respect to any of the discussed terms and conditions of Plaintiff's employment with Defendant.

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). However, as the Seventh Circuit has noted, "[n]ot every unpleasant workplace is a hostile environment." *Wyninger v. New Venture Gear, Inc*., 361 F.3d 965, 977 (7th Cir. 2004). Specifically, "[t]he workplace that is actionable is the one that is hellish." *Id.*

In determining employer liability for a hostile work environment, the employer is essentially strictly liable if the employee's supervisor created the hostile work environment. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). The employer is liable for a hostile work environment created by the employee's coworkers, however, only when the employee shows that his employer has "been negligent either in discovering or remedying the harassment." *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir.1998).

In her Complaint, Plaintiff contends that Defendant's management and employees created a hostile work environment.  Plaintiff testified that her co-worker, Ms. Rodriguez, verbally and physically abused her continually beginning in December 2001 by elbowing and bumping into Plaintiff when passing by Plaintiff in their work area, yelling at Plaintiff, acting belligerent to Plaintiff, giving Plaintiff the finger, and yelling to co-workers not to help Plaintiff.

Although the above described harassment was unwelcome and therefore satisfies the first prong of a *prima facie* case of hostile work environment, Plaintiff has presented virtually no evidence to satisfy the second prong–that the harassment was based on race.  Plaintiff testified that on only one occasion did she mention that Ms. Rodriguez's actions were because of Plaintiff's race. During a meeting on or about May 30, 2003, which was held at Plaintiff's request to discuss whether

19

it was Plaintiff or Ms. Rodriguez's responsibility to carry out a specific quality control task, Plaintiff told Defendant's managers that the only reason Ms. Rodriguez would not take responsibility for the quality control task was because of Plaintiff's race.

Regarding the third prong, the Court finds that the instances Plaintiff alleges lack the severity or pervasiveness needed to create an actionable hostile work environment claim.  In addition, Plaintiff has presented no evidence that Ms. Rodriguez's behavior was on its face racially harassing. *See Russell v. Bd. of Trs. of Univ. of Ill. at Chicago*, 243 F.3d 336, 344 (7th Cir.2001) (citing *Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464, 467-68 (7th Cir.1998)) (noting that even "relatively isolated comments suggesting bias against ethnic minorities [was] insufficient to survive summary judgment"). While Plaintiff may have subjectively felt that her workplace environment was unpleasant, her allegations of harassment neither create a "hellish" workplace nor one that is "permeated with discriminatory intimidation, ridicule and insult." *Shanoff*, 258 F.3d at 704.

Even if this Court were to find that Plaintiff's alleged harassment was sufficiently severe or pervasive so as to create a hostile or abusive working environment, Plaintiff has only presented evidence of harassment by co-workers (not supervisors) and thus Defendant can be liable only if it was negligent in either discovering or remedying the harassment.  *See Parkins,* 163 F.3d at 1032. As previously discussed, Plaintiff has presented no evidence that Ms. Rodriguez's behavior was on its face racially harassing.  The only mention ever made to management regarding race was when Plaintiff told Defendant's managers that the only reason Ms. Rodriguez would not take responsibility for the quality control task was because of Plaintiff's race.  Plaintiff did not mention race in connection with any alleged harassment by Ms. Rodriguez or by any other co-workers.  In addition, Plaintiff made no written complaints of racial harassment to Defendant.  The Court finds

20

that the Defendant was not negligent in discovering or remedying the alleged harassment.  As a result, no genuine issue of material fact exists with respect to Plaintiff's hostile work environment claim.

**CONCLUSION**

Based on the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment [DE 57] and **ORDERS** the Clerk of the Court to enter judgment in favor of the Defendant and against the Plaintiff, Cheryl Upshaw.

The Court **VACATES** all pretrial and trial settings, including the Final Pretrial Conference set for **February 9, 2007**.

SO ORDERED this 7th day of February, 2007.


s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT


cc:     All Counsel Of Record
        *Pro se* Plaintiff Cheryl Upshaw

21